**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALYSSA MAYS,<br>*individually and on behalf of all others*<br>*similarly situated*,<br><br>                       Plaintiffs,<br>v.<br><br>HAIN CELESTIAL GROUP, INC.,<br><br>          Defendant. | CASE NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff ALYSSA MAYS ("Plaintiff"), on behalf of herself and all others similarly situated, by her undersigned attorneys, against Defendant, HAIN CELESTIAL GROUP, INC. (hereafter "Hain" or "Defendant"), alleges the following based upon personal knowledge as to herself and her own action, and, as to all other matters, alleges, upon information and belief and investigation of her counsel, as follows:

## INTRODUCTION

1.      This is a consumer class action brought individually by the Plaintiff individually and on behalf of all persons in the below-defined proposed Class, all of whom purchased one or more of certain baby foods manufactured by Hain.[1]

---

[1] The products at issue are all baby foods sold by Defendant that contain one or more of the following ingredients: organic barley flour, organic chopped broccoli, organic date paste, organic cinnamon powder, organic brown flax milled, organic yellow papaya puree, organic whole what fine, organic red lentils, organic oat flakes, organic oat flour; organic vitamin pre-mix, organic brown rice flour, organic whole raisins, organic soft white wheat flour, organic spelt flour, organic barley malt extract, organic yellow split pea powder, medium grain whole rice, organic butternut squash puree, and organic blueberry puree, and include, Stage 1: Baby Chicken & Chicken Broth, Stage 2: Sweet Potato and Chicken Dinner; Stage 2: Chicken & Rice (the "Products"). Discovery may reveal additional products at issue.

2.     Hain manufactures, markets, advertises, labels, distributes, and sells baby food products under the brand name Earth's Best throughout the United States, including in this District.

3.     Hain states that "it ensures a high degree of attention to both ingredient and product quality and safety – from procuring, handling, storing, blending, and packaging through distributing Earth's Best® products to our consumer."[2]

4.     Hain further states it "ensures the best ingredients for our food and ultimately the best food for your children."[3]

5.     Hain does not list heavy metals as an ingredient on the Products' labels nor does it warn of the potential presence of heavy metals in the Products. Hain also does not disclose that the ingredients of its supposedly organic Products contain inorganic arsenic.

6.     Unbeknown to Plaintiff and members of the Class, and contrary to the representations on the Products label, the Products contain heavy metals, including inorganic arsenic, cadmium and lead at levels above what is considered safe for babies, which, if disclosed to Plaintiff and members of the Class prior to purchase, would have caused Plaintiff and members of the Class not to purchase or consume the Products.

7.     As a result, the Products' labeling is deceptive and misleading.

8.     Plaintiff and the Class, as defined below, thus bring claims for consumer fraud and seek damages, injunctive and declaratory relief, interest, costs, and attorneys' fees.

**THE PARTIES**

9.     Plaintiff Alyssa Mays is a citizen of the State of Ohio and is a member of the Class defined herein. She purchased the Products, including Stage 1: Baby Chicken & Chicken Broth,

---

[2] *See* https://www.earthsbest.com/why-earths-best/.
[3] *Id.*

Stage 2: Sweet Potato and Chicken Dinner, and Stage 2: Chicken & Rice. Plaintiff purchased the Products primarily from Kroger in Mount Orab, Ohio from around March of 2020, until she became concerned about the presence of heavy metals in February 2021.

10.     Prior to purchasing the Products, Plaintiff Mays saw Defendant's nutritional claims on the packaging, including "Earth's Best," "organic" and "nurturing baby the purest way," which she relied on in deciding to purchase the Products. During that time, based on Defendant's omissions and the false and misleading claims, warranties, representations, advertisements and other marketing by Defendant, Plaintiff Mays was unaware that the Products contained any level of heavy metals, including inorganic arsenic, and would not have purchased the food if that was fully disclosed, or she would not have paid as much for the Products if that information was fully disclosed. She stopped purchasing the Products in February 2021, when she became aware that the Products contained heavy metals. Plaintiff Mays was injured by paying a premium for the Products that have no or de minimis value—or whose value was at least less than what she paid for the Products—based on the presence of the alleged heavy metals.

11.     Defendant Hain Celestial Group, Inc. is an American food company with its headquarters located in Lake Success, New York.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 (hereinafter referred to as "CAFA") codified as 28 U.S.C. § 1332(d)(2) because the claims of the proposed Class members exceed $5,000,000 and because Defendant is a citizen of a different state than most Class members.

13.     This Court has personal jurisdiction over Defendant because Defendant regularly sells and markets products and conducts business in this District and/or under the stream of commerce doctrine by allowing products to be sold in this District, including the Products.

14.     Venue is proper in this Court because a substantial portion of the events complained of took place in this District and this Court has jurisdiction over the Defendant.

## FACTUAL ALLEGATIONS

15.     The market for baby foods is exploding. The baby foods market worldwide is projected to grow by $22.7 billion by the year 2025.[4]

16.     Along with the exploding baby food market is a surge in popularity of baby food products that are organic and otherwise 'healthy' for babies.[5]

17.     Defendant manufactures, markets, advertises, labels, distributes, and sells Products, both in the past and currently. Defendant has advertised and continues to advertise the Products through television commercials, print advertisements, point-of-sale displays, product packaging, Internet advertisements, and other promotional materials.

18.     On the label of each of the Products, Hain prominently boasts that the Products are derived from ingredients that are: (i) "Earth's Best," (ii) "organic" and (iii) "nurturing baby the purest way:"

---

[4] https://www.researchandmarkets.com/reports/338658/baby_foods_and_infant_formula_global_market?utm_source=dynamic&utm_medium=BW&utm_code=b559sk&utm_campaign=138612+-+Global+Baby+Foods+and+Infant+Formula+Market+Assessment+2020-2025&utm_exec=joca220bwd.

[5] *Id.*





19.    Defendant's packaging of the Products also does not disclose the presence, or risk of, heavy metals.

5

20.     Hain directs the representations made on the Products' packaging to consumers, like Plaintiff and the members of the Class, and Hain intends that the Plaintiff and members of the Class read and rely on its representations.

21.     Hain makes these representations because it knows that healthy baby food is a material factor in baby food purchasing decisions to consumers like the Plaintiff and members of the Class.

22.     However, contrary to the representations made on the label and packaging of the Products, the Products contain heavy metals, including arsenic, cadmium, and lead at levels above what is considered safe for babies. In addition, the arsenic contained in the ingredients of the Products is "inorganic," despite Defendant's labeling all of the Products as "organic".

23.     An investigation by the U.S. House of Representatives Subcommittee on Economic and Consumer Policy revealed that baby foods manufactured by Hain are tainted with significant levels of toxic heavy metals, including arsenic, lead, and cadmium.[6]

24.     Exposure to heavy metals causes permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior in children. Toxic heavy metals endanger infant neurological development and long-term brain function. Lead and arsenic are heavy metals known to cause a wide spectrum of adverse outcomes in pregnancy such as abortions, retarded growth at the intrauterine cavity, skeletal deformities, malformations and retarded development especially of the nervous system.

25.     Specifically, the Subcommittee found that:

---

[6] U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Staff Report, "Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium and Mercury (Feb. 4, 2021).

a.      Hain sold finished baby food products containing as much as 129 parts per billion (ppb) inorganic arsenic. Hain used ingredients, including brown rice flour, that had tested as high as 309 ppb arsenic;

b.      Hain used ingredients containing as much as 352 ppb lead. Hain used many ingredients with high lead content, including 88 that tested over 20 ppb lead and six that tested over 200 ppb lead;

c.      Hain used 102 ingredients in its baby food that tested over 20 ppb cadmium. Some tested much higher, up to 260 ppb cadmium;

d.      Hain used 14 ingredients that contained more than 100 ppb cadmium, including barley flour that registered at 260 ppb cadmium. That is thirteen times the EU's lax upper limit on cadmium in baby food;

e.      Hain does not even test for mercury in baby food;

f.      Hain set an internal limit of 200 ppb for lead in five ingredients—forty times higher than FDA's guidance for bottled water. By doing so, Hain justified accepting lentil flour with 110 ppb lead and quinoa flour with 120 ppb lead. These surpass every existing regulatory standard for lead; and

g.      Hain set an internal standard of 200 ppb for arsenic, lead, and cadmium in some of its ingredients. Hain justified deviations above its ingredient testing standards based on "theoretical calculations," even after Hain admitted to FDA that its testing underestimated final product toxic heavy metal levels.

26.      These results are multiples higher than allowed under existing regulations for other products. For example, the Food and Drug Administration has set the maximum allowable levels in bottled water at 10 ppb inorganic arsenic, 5 ppb lead, and 5 ppb cadmium, and the Environmental

Protection Agency (EPA) has capped the allowable level of mercury in drinking water at 2 ppb. The test results of baby foods and their ingredients eclipse those levels: including results up to 91 times the arsenic level, up to 177 times the lead level, up to 69 times the cadmium level, and up to 5 times the mercury level.

27.     Young children are particularly vulnerable to lead because the physical and behavioral effects of lead occur at lower exposure levels in children than in adults. A dose of lead that would have little effect on an adult can have a significant effect on a child. In children, low levels of exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells.[7]

28.     EPA has set the maximum contaminant level goal for lead in drinking water at zero because lead is a toxic metal that can be harmful to human health even at low exposure levels. Lead is persistent, and it can bioaccumulate in the body over time.[8]

29.     The Agency for Toxic Substances and Disease Registry states that there may be no threshold for lead with regards to developmental impact on children. "In other words there are no safe limits for Pb." [9]

30.     There is no established safe level of inorganic arsenic consumption for babies. Organizations such as Healthy Babies Bright Futures have called for a goal of no measurable amount of inorganic arsenic in baby food. Consumer Reports suggests setting inorganic arsenic levels as low as 3 ppb. FDA has already set maximum inorganic arsenic levels at 10 ppb for bottled

---

[7] *See* https://www.cdc.gov/nceh/lead/prevention/pregnant.htm.
[8] *See* https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.
[9] G. Schwalfenberg, I. Rodushkinb, S.J. Genuis, "Heavy metal contamination of prenatal vitamins," Toxicology Reports 5 at 392 (2018).

water. EPA has similarly set a 10-ppb inorganic arsenic cap on drinking water, as have the European Union (EU) and the World Health Organization (WHO).[10]

31.     Arsenic is ranked number one among substances present in the environment that pose the most significant potential threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry (ATSDR).[11]

32.     The known health risks of arsenic exposure include "respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[12]

33.     Studies have concluded that arsenic exposure has a "significant negative effect on neurodevelopment in children."[13]

34.     This negative effect is most pronounced in Full Scale IQ, and more specifically, in verbal and performance domains as well as memory. For every 50% increase in arsenic levels, there is an approximately "0.4 decrease in the IQ of children."[14]

35.     Cadmium is number seven on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[15]

36.     Cadmium is associated with decreases in IQ, as well as the development of ADHD. A 2018 study found that cadmium exposure negatively affected children's Full Scale IQ, particularly among boys.[16]

---

[10] *See* US Report, *supra* n.3, at 13
[11] *Id*. at 10.
[12] *Id*.
[13] *Id*.
[14] *Id*.
[15] *Id*. at 12.
[16] *Id*.

37.     Boys exhibiting higher amounts of cadmium exposure had seven fewer IQ points than those exhibiting less cadmium exposure.[17]

38.     A 2015 study similarly found a significant inverse relationship between early cadmium exposure and IQ.[18]

39.     A 2018 study linked cadmium exposure to ADHD, finding that the disorder was more common among children with the highest levels of cadmium exposure as compared to a control group.[19]

### *Plaintiff Relies Upon the Products' Label to Purchase the Products*

40.     Plaintiff was a victim of Defendant's mislabeling of the Products.

41.     Prior to each purchase, Plaintiff viewed the labels on Defendant's Products, including the representations that they are: (i) "Earth's Best," (ii) "organic" and (iii) "nurturing baby the purest way:" Each time, Plaintiff reasonably relied upon the labels on Defendant's Products before purchasing them. In particular, Plaintiff purchased the Products believing they would provide her child with a healthy organic baby food, as claimed on the label and packaging of the Products.

42.     Defendant's labeling claims were a material factor in Plaintiff's decision to purchase Defendant's Products.

43.     At the point of sale, Plaintiff did not know, and had no reason to know, that Defendant's Products were mislabeled as set forth herein.

44.     At the point of sale, Plaintiff did not know, and had no reason to know, that Defendant's nutrient content claims on the Products' labels were unlawful as set forth herein.

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

45.     Plaintiff later learned that the Products contain unsafe levels of heavy metals and inorganic arsenic. Plaintiff was deceived as a result of Defendant's false and misleading marketing practices. Plaintiff believed she was buying a product that was providing her baby with a healthy organic baby food.

46.     Plaintiff would not have purchased or paid a price premium for the Products had she known they contained unsafe levels of heavy metals and inorganic arsenic.

47.     Plaintiff is in the same Class as all other consumers who purchased Defendant's Products during the relevant time period. Plaintiff and the Class members were in fact misled by Defendant's misrepresentations in respect to the Products. Plaintiff and Class members would have purchased other foods for their children if they had not been deceived by the misleading and deceptive labeling of the Products by Defendant.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23. The Class definition(s) may depend on the information obtained throughout discovery.

49.     Plaintiff Mays (the "Ohio Plaintiff") seeks certification of the following subclass (the "Class" or the "Ohio Class"):

> All persons in the State of Ohio who purchased and consumed the Products from the beginning of any applicable limitations period through the date of class certification.

50.     Excluded from the Class are the Defendant, and any entities in which the Defendant has controlling interest, the Defendant's agents, employees and their legal representatives, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, and Plaintiff's counsel, their staff members, and their immediate family.

51.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

52.     **Numerosity – Fed. R. Civ. P. 23(a)(1).** The members of the Class is so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands to tens of thousands. The number of members in the Class is presently unknown to Plaintiff but may be verified by Defendant's records. Members of the Class may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

53.     **Commonality and Predominance – Fed. R. Civ. P. 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, but are not limited to, the following:

    a.     Whether the Products contain dangerous levels of heavy metals;

    b.     Whether the Products are 'organic,';

    c.     Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive;

    d.     Whether Defendant's actions violate the state consumer fraud statutes invoked below;

    e.     Whether Defendant's actions constitute common law fraud;

    f.     Whether Plaintiff and members of the Class were damaged by Defendant's conduct;

    g.     Whether Defendant was unjustly enriched at the expense of Plaintiff and Class members; and

h.      Whether Plaintiff and Class members are entitled to injunctive relief.

54.     **Typicality – Fed. R. Civ. P. 23(a)(3).** The claims of the named Plaintiff are typical of the claims of other members of the Class. All members of the Class were comparably injured by Defendant's conduct described above, and there are no defenses available to Defendant that are unique to Plaintiffs or any particular Class members.

55.     **Adequacy of Representation – Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of other Class members, she has retained class counsel competent to prosecute class actions and financially able to represent the Class.

56.     **Declaratory and Injunctive Relief – Fed. R. Civ. P. 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole. In particular, Plaintiff seeks to certify a Class to enjoin Defendant from selling or otherwise distributing Products until such time that Defendants can demonstrate to the Court's satisfaction that Products are accurately labeled.

57.     **Superiority – Fed. R. Civ. P. 23(b)(3).** A class action is superior to any other means of adjudication for this controversy. It would be impracticable for members of the Class to individually litigate their own claims against Defendant because the damages suffered by Plaintiff and the members of the Class are relatively small compared to the cost of individually litigating their claims. Individual litigation would create the potential for inconsistent judgments and delay and expenses to the court system. A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT 1

## VIOLATIONS OF OHIO CONSUMER SALES PRACTICES ACT,
### Ohio Rev. Code Ann. § 1345.01 *et seq.*
#### (On behalf of the Ohio Class)

58.     The Ohio Plaintiff identified above, individually and on behalf of the Ohio Class, repeats and re-alleges all previously alleged paragraphs, as if fully alleged herein.

59.     The Ohio Consumer Sales Practices Act, O.R.C. § 1345.02 (the "Act"), prohibits unfair or deceptive acts or practices in connection with a consumer transaction. For example, the Act prohibits suppliers from representing that goods have characteristics or uses or benefits which they do not have. The Act also prohibits suppliers from representing that their products or goods are of a particular standard, quality, or grade if they are not; that the products or goods have been supplied in accordance with a previous representation, if they have not; and that the transaction involves a warranty, rights, remedies, or obligations if that representation is false. Defendant's actions as described throughout this Complaint violate each of these provisions.

60.     The Ohio Consumer Sales Practices Act, O.R.C. § 1345.03, also prohibits unconscionable acts or practices in connection with a consumer transaction which includes the circumstances at issue here where Defendant has knowingly taken advantage of the inability of consumers reasonably to protect their interests because of the consumers' ignorance of the toxic levels of heavy metals present in the Products and because Defendant knowingly made misleading statements of opinion on which Plaintiff was likely to rely to her detriment as discussed throughout this Complaint.

61.     Defendant is a "supplier" as that term is defined in O.R.C. § 1345.01(C).

62.     Plaintiff and the Ohio Class members are "consumers" as that term is defined in O.R.C. § 1345.01(D).

63.     Defendant advertised, offered, or sold goods or services in Ohio and engaged in trade or commerce directly or indirectly affecting the people of Ohio and the Ohio Class members.

64.     Defendant's conduct alleged above constitutes unfair, deceptive, and unconscionable acts and practices in connection with a consumer transaction in violation of O.R.C. § 1345.02 and § 1345.03.

65.     Defendant's conduct was also unfair, deceptive, and unconscionable because Defendant required the Ohio Plaintiff and the Ohio Class to enter into consumer transactions on terms that Defendant knew were substantially one-sided in favor of Defendant (Ohio Rev. Code Ann. § 1345.03(B)(5)).

66.     Defendant's conduct as alleged above and throughout this Complaint constitutes an act or practice previously declared to be deceptive or unconscionable by rule adopted under division (B)(2) of § 1345.05 and previously determined by Ohio courts to violate Ohio's Consumer Sales Practices Act and was committed after the decisions containing these determinations were made available for public inspection under division (A)(3) of O.R.C. § 1345.05. The applicable rule and Ohio court opinions include but are not limited to: OAC 109:4-3-16; *Cordray v. Dannon Co.*, PIF No. 10002917 (Dec. 22, 2010); *Brown v. Hartman*, PIF No. 10000070 (Nov. 15, 1982); and *In re United Egg Producers*, PIF No. 10002495 (Oc. 12, 2006).

67.     These misrepresentations constitute the use by Defendant of unconscionable commercial practices, deception, and misrepresentation and, thus constitutes multiple, separate violations of Ohio Revised Code § 1345.01, *et seq*.

68.     Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

69.     Defendant's unfair, deceptive, and unconscionable acts and practices complained of herein affected the public interest, including the thousands of Ohio residents who purchased and/or used the Products.

70.     Defendant's conduct caused substantial damages to the Ohio Plaintiff and the Class members as alleged herein because (a) they would not have purchased the Products, or would not have purchased the Products on the same terms, had they known that the Products in fact contained heavy metals; (b) they paid a price premium for Products based on Defendant's false, deceptive, and misleading statements; and (c) the Products did not have the characteristics and benefits promised because they contained heavy metals.

71.     Accordingly, the Ohio Plaintiff and Class members suffered damages and are entitled to recover damages and attorneys' fees pursuant to Ohio Revised Code § 1345.09.

## COUNT 2

### UNJUST ENRICHMENT
### (On Behalf of the Ohio Class)

72.     Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

73.     Plaintiff brings this claim against Defendant on behalf of herself and the Class.

74.     Plaintiff and the other members of the Class conferred benefits on Defendant by purchasing the Products.

75.     Defendant received the benefits to the detriment of Plaintiff and the other members of the Class because Plaintiff and the other members of the Class purchased a mislabeled product that is not what they bargained for and did not provide the advertised benefit.

76.     Defendant has been unjustly enriched in retaining the revenues derived from the purchases of the Products by Plaintiff and the other members of the Class. Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to Plaintiff and the other members of the Class, because they would have not purchased the Products had they known the true facts.

77.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and the other members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the other members of the Class for its unjust enrichment, as ordered by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment as follows:

A.     Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing the undersigned counsel as Class Counsel for the Class;

B.     Ordering Defendant to pay actual damages to Plaintiff and the other members of the Class;

C.     Ordering Defendant to pay restitution to Plaintiff and the other members of the Class;

D.     Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiff and the other members of the Class;

E.     Ordering Defendant to pay statutory damages, as provided by the applicable state consumer protection statutes invoked herein, to Plaintiff and the other members of the Class;

F.     Ordering Defendant to pay reasonable attorneys' fees and litigation costs to Plaintiff and the other members of the Class, as allowable by law;

G.     Ordering Defendant to pay both pre- and post-judgment interest, as allowable by law, on any amounts awarded; and

H.     Ordering such other and further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all claims in this Complaint so triable. Plaintiff also respectfully requests leave to amend this Complaint to conform to the evidence, if such amendment is needed for trial.

Dated: February 9, 2021                  Respectfully submitted,

*/s/ Gary E. Mason*
Gary E. Mason
**MASON LIETZ & KLINGER LLP**
5101 Wisconsin Avenue NW, Suite 305
Washington, DC 20016
Phone: (202) 429-2290
Fax: (202) 429-2294
gmason@masonllp.com

Jonathan Shub
Kevin Laukaitis
**SHUB LAW FORM LLC**
134 Kings Highway E., 2nd Floor
Haddonfield, NJ 08033
Phone: (856) 772-7200
Fax: (856) 210-9088
jshub@shublawyers.com
klaukaitis@shublawyers.com

Gary M. Klinger*
**MASON LIETZ & KLINGER LLP**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (202) 429-2290
Fax: (202) 429-2294
gklinger@masonllp.com

Jeffrey S. Goldenberg*
**GOLDENBERG SCHNEIDER L.P.A.**
4445 Lake Forest Drive, Suite 490
Cincinnati, OH 45242
Phone: (513) 345-8297
Fax: (513) 345-8294
jgoldenberg@gs-legal.com

Charles E. Schaffer*
David C. Magagna Jr.*
**LEVIN, SEDRAN & BERMAN, LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
cschaffer@lfsblaw.com
dmagagna@lfsblaw.com

*Attorneys for Plaintiff and the proposed Class*

*\*pro hac vice to be filed*